IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Jerome McDermott | ) | |
| | ) | Civil Action No. 0:05 - 1044-DCN-BM |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER and OPINION** |
| | ) | |
| Jo Anne B. Barnhart, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on Magistrate Judge Bristow Marchant's Report and Recommendation that this court reverse the Commissioner's decision denying plaintiff disability insurance benefits ("DIB") under the Social Security Act ("the Act"). The record includes a Report and Recommendation ("Report") of the United States Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1)(B).

## I.     PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB on April 25, 1990 alleging a disability beginning June 13, 1989 due to back pain, glaucoma in both eyes with resultant headaches, angina, and bilateral hearing loss. (R. 58-59.) The claim was initially denied on July 26, 1990 (R. 103) and denied again on reconsideration. (R. 116.) Plaintiff filed a timely request for a hearing, and the Administrative Law Judge J. Lawson Brown ("ALJ") conducted the hearing and denied plaintiff's application on June 26, 1991. (R.216.) The Appeals Council denied plaintiff's request for review on October 10, 1995 (R. 2), and plaintiff filed suit in the United States District Court for the Northern District

of New York.  The New York district court remanded the case for further consideration on May 10, 1997.  (R. 262.)  After a supplemental hearing on September 11, 1998, the claimant's application was again denied by Administrative Law Judge Hastings Morse in a decision issued October 22, 1998.  (R. 224.)  The Appeals Council denied plaintiff's request for review on January 29, 2005 (R. 193), making the ALJ's decision the Commissioner's final decision for purposes of judicial review.

## II.    PERTINENT FACTS

Plaintiff was 43 years old as of his alleged onset of disability and 49 years old on the date he was last insured.  (R. 91, 223.)  He completed the eighth grade in 1959 and worked as a die caster/set up for a manufacturing company from 1972 to 1989. (R.128.)  During that time, plaintiff also worked part time as a town constable from 1972 to 1980. (R.128.)  The record indicates that plaintiff first injured his back at work in 1975. (R. 188.)  He was out of work for approximately 9 weeks, and doctors determined that he had a lumbar disc herniation.  (R. 188.)  In 1985-86, plaintiff's back troubled him again, and he was out of work for five days.  (R. 188.)  He was then able to return to work without incident until 1989.  (R. 188.)

In June of 1989, plaintiff re-injured his back.  (R. 154.)  He felt a "twinge" in his back when he stood up from a table (R. 160.)  The pain in his lower back and left leg persisted for ten days.  (R. 154.)  Plaintiff was admitted to Benedictine Hospital where he was placed on strict bed rest.  (R. 146.)  Plaintiff was prescribed pain medications and treated conservatively.  (R. 146.)  Although his symptoms and pain improved with bed rest, the doctors noted no change in his neurologic examination.  (R. 146.)  Plaintiff has

not been able to return to work since this incident.  (R. 124.)

While plaintiff was in the hospital, plaintiff's family physician, Dr. Jaeger, referred him to Dr. Gabriel Aguilar for treatment.  (R. 146.)  Dr. Aguilar saw plaintiff on June 24, 1989.  (R. 181.)  Plaintiff complained of low back pains, some pain in his left upper-lower gluteal region and numbness on the lateral part of his foot.  (R. 181.)  He also indicated that the pain in his left leg was gone.  (Tr. 181.)  Dr. Aguilar reviewed plaintiff's CT scan and found the abnormality "quite minimal."  (R. 181.)  Plaintiff's neurological examination was normal and his motor examination revealed "excellent strength in all four extremities."  (R. 181.)  Dr. Aguilar opined that plaintiff suffered from low back pain syndrome with radiculopathy secondary to discogenic disease, and he recommended that plaintiff be treated conservatively with medications and physical therapy.  (R. 181.)

On March 27, 1990, Dr. Aguilar completed a report for the Office of Vocational Rehabilitation.  He stated that plaintiff suffered from paraspinal spasms of minimal nature and tenderness over the lumbosacral area with limitations of movement.  (R. 158.)  He further noted that plaintiff should avoid lifting over 50 pounds and should avoid excessive bending.  (R. 159.)

Plaintiff was treated again by Dr. Aguilar in April 1990.  Dr. Aguilar's treatment notes indicate that plaintiff's neurological examinations were unremarkable, and that plaintiff's examination revealed minimal tenderness over the sacroiliac joint area on the right side.  He advised plaintiff to continue taking Voltaren (50 mg) and also prescribed Flexeril (10 mg).  (R. 151.)  In May of 1990, Dr. Aguilar noted that plaintiff's chronic

low back pain syndrome secondary to discogenic condition prevented him from heavy lifting, excessive bending, or prolonged sitting, yet he noted that plaintiff was able to perform sedentary work.  (R. 157.)

Dr. Aguilar examined plaintiff again in August and September of 1990 and found that his neurological examination showed "decreased sensation over the anteriolateral thigh on the left side and very diminished ankle jerks." (R. 156.)  Plaintiff's strength in his left big toe appeared to have decreased, and his lumbar musculoskeletal examination "reveal[ed] tenderness over both sacroiliac joint areas" and "limitation of movements in all directions due to muscle spasms and tenderness." (R. 156.)  Dr. Aguilar found that plaintiff was "doing reasonably well with conservative treatment" but was unable to perform his usual job because of continuous lifting requirements and bending.  (R.156.) He suggested that plaintiff could perform sedentary work. (R. 156.)   The same month, September of 1990, Dr. Aguilar completed a report for the Worker's Compensation Board in which he stated that plaintiff was totally disabled.  (R. 182.)

In April 1991, Dr. Aguilar referred plaintiff to Dr. George Forrest for other modalities of treatment.  (R. 191.)  In his referral letter, Dr. Aguilar noted that plaintiff was treated conservatively and benefitted from anti-inflammatory medication.  He also stated that at one point plaintiff was to return to work, but he was "unable to perform his heavy job and had multiple other relapses."  (R. 191.)  He indicated that plaintiff was not a candidate for surgery at that time.  (R. 191-92.)

Plaintiff was treated by Dr. Forrest and his colleague Dr. Dubin from 1991 to1995.  In May 1991, Dr. Dubin noticed that plaintiff walked with an "antalgic" and

"stiff" gait. (R. 29.) He noted that plaintiff experienced "decreased range in all planes with pain on forward flexion, lateral flexion to the right, all causing discomfort in the left lower back," as well as pain with hyperextension. (R. 29.) Dr. Dubin diagnosed plaintiff with chronic low back pain with probable discogenic etiology with a probable super imposed myofascial pain syndrome. (R. 29.) He continued plaintiff's medications and suggested physical therapy may be beneficial. (R. 31.) He also stated that he

> did not anticipate at this time that Mr. McDermott will be able to return to his line of previous employment as a die caster. Should he have a good response to pharmacologic and therapeutic intervention, he might ultimately be able to return to a sedentary job that allows frequent position changes and does not entail any lifting.

(R. 31.)

In June of 1991, plaintiff reported that he was able to walk about three miles, with several rest periods, with no worsening of pain. (R. 28.) Dr. Dubin also noted that plaintiff felt a "slight reduction in his low back pain with this activity." (R. 28.) Dr. Dubin instructed plaintiff how to perform certain back exercises, and he started plaintiff on 10 mg of Elavil to help plaintiff sleep and to help relieve pain. (R. 28.)

In July 1991 plaintiff was treated by Dr. Forrest. (R. 27.) Dr. Forrest noted that plaintiff complained of "no feeling from his left hip to his left knee." (R. 27.) Dr. Forrest indicated that plaintiff's strength was normal but that his gait was "quite antalgic." (R. 27.) Plaintiff also "tolerate[d] very little flexion or extension of the spine." (R. 27.) In August, 1991, Dr. Forrest noted that plaintiff continued to experience "discomfort with radiation to the left lower extremity" and that plaintiff still cannot lift, bend or sit for a

prolonged period of time. (R. 26.) He recommended that plaintiff continue with his physical therapy. (R. 26.)

In October 1991, Dr. Dubin indicated plaintiff displayed "marked limitations in all range of motions of the lumbar spine" and that his neurological exam was "unremarkable." (R. 25.)  In November 1991, plaintiff revealed to Dr. Dubin that he had experienced "some progressive stiffness in his back" which Dr. Dubin attributed to "an increase in his level of physical activity starting approximately one week ago with the addition of bicycle ergometry and tread-mill walking in physical therapy." (R. 24.) Dr. Dubin instructed plaintiff to continue with his physical therapy, but he decreased the intensity of his treadmill walking and bicycle ergometry in order to make the exercises more tolerable for plaintiff. (R. 24.)

In January of 1992, Dr. Dubin reported that he was pleased with plaintiff's "slow but steady progress." (R. 22.) On physical examination, Dr. Dubin noted that plaintiff still had "marked limitations in lumbar range of motion with flattening of the lumbar lordosis on attempts at forward flexion," as well as "definite spasming" (R. 22.) He encouraged plaintiff to continue therapy, and he also issued plaintiff a prescription for 5 mg of Balcofen to help "decrease the tone in his lumbar paraspinals and further facilitate his range of motion and decrease his pain." (R. 22.) In March, 1992 and again in May, 1992, plaintiff was examined by Dr. Forrest. (R. 20-21.)  Dr. Forrest reported that plaintiff had "severe pain in his low back which is present all of the time" and that plaintiff "has no tolerance for bending or lifting and has difficulty with sitting for any significant amount of time." (R. 21.)  He also noted that plaintiff "does not feel that he is

ready for any form of Work Hardening Program." In May, Dr. Forrest noted that plaintiff indicated that he would like "to begin some kind of vocational rehabilitation or community college work in the Fall." (R. 20.)

Plaintiff was not able to pursue vocational rehabilitation for long.  The record contains a Notice of Closure issued by the Office of Vocational Rehabilitation which notified plaintiff that his rehabilitation case was closed on December 11, 1992 due to his medical condition. (R. 19.) The letter states, "You understand that your extensive various physical limitations which necessitate the use of much pain medication makes you too severely disabled at this time to benefit from vocational rehabilitation services."  (R. 19.)

In January, 1993 Dr. Dubin reported that plaintiff "has had a definite reduction in his pain" due to his pharmacologic regimen of Lioresal, Ansaid and Elavil; however, plaintiff "still reports constant pain in the low back with radiation into the lower extremities." (R. 17.) His forward flexion was limited to 30 degrees and his back hyperextension was less than 10 degrees. (R. 17.) Dr. Dubin also noted that "[f]orward flexion causes pain to radiate down the left lower extremity and back hyperextension causes focalization of pain at the L4-5 level."  Dr. Dubin encouraged plaintiff to continue his once a week physical therapy sessions and increased his Elavil to 100 mgs. (R. 17.) He also noted that plaintiff "remains totally disabled." (R. 17.)

In July, 1993, Dr. Dubin noted that plaintiff was previously prescribed a "lumbosacral corset and instructed to wear the corset while up and about during the day." (R. 8.) Plaintiff told Dr. Dubin that he noticed a decrease in pain while wearing the corset while sitting for long periods of time; however, he also indicated that he noticed an

"intensification of pain when wearing the brace when standing." (R. 8.) Dr. Dubin

discussed the possibility of alternate forms of pain relief, and he discussed lumbar

epidurals with plaintiff.  Plaintiff told Dr. Dubin that he was "not interested in lumbar

epidural as he has had rather bad experiences related to him by friends regarding lumbar

punctures." (R. 8.) During plaintiff's September, 1993 visit, Dr. Dubin against discussed

different pharmacological options for plaintiff to pursue, but plaintiff indicated that he

was not ready to pursue facet joint injections or steroid epidurals at that time. (R. 13.)

During this visit, Dr. Dubin again noted that he considered plaintiff "persists with a total

disability." (R. 13.)  In May, 1994, Dr. Dubin reported that plaintiff "remains totally

disabled" (R. 7.)

 Two State Agency physicians reviewed plaintiff's medical records. (R. 95-102,

108-15.) Both doctors found that plaintiff could: occasionally lift and/or carry (including

upward pulling) 20 pounds; frequently lift and/or carry (including upward pulling) 10

pounds); stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour

workday; sit (with normal work breaks) for a total of about 6 hours in an 8-hour

workday; and that his ability to push and/or pull (including the operation of hand and/or

foot controls) was unlimited, other than as shown for lift and/or carry. (R. 96, 109.) In

reviewing plaintiff's medical records, the physicians both indicated that plaintiff could

occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. 97, 110.)

## III. SCOPE OF REVIEW

 This court is charged with conducting a de novo review of any portion of the

magistrate judge's Report and Recommendation to which a specific, written objection is

made.  28 U.S.C.A. § 636(b)(1).  A party's failure to object is accepted as agreement with the conclusions of the magistrate judge.  See Thomas v. Arn, 474 U.S. 140 (1985).  This court is not required to review, under a de novo standard, or any other standard, the factual findings and legal conclusions of the magistrate judge to which the parties have not objected.  See id. at 149-50.  A party's general objections are not sufficient to challenge a magistrate judge's findings.  Howard v. Secretary of Health & Human Servs., 932 F.2d 505, 508-09 (6th Cir. 1991).  The recommendation of the magistrate judge carries no presumptive weight, and the responsibility to make a final determination remains with this court.  Matthews v. Weber, 423 U.S. 261, 270-71 (1976).  This court may accept, reject, or modify the Report and Recommendation of the magistrate judge, in whole or in part, or may recommit the matter to him for further consideration.  28 U.S.C.A. § 636(b)(1).

Although this court may review the magistrate judge's recommendation de novo, judicial review of the Commissioner's final decision regarding disability benefits "is limited to determining whether the findings of the [Commissioner] are supported by substantial evidence and whether the correct law was applied."  Hays v. Sullivan, 907 F/2d 1453, 1456 (4th Cir. 1990).  "Substantial evidence" has been defined as

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, there is "substantial evidence."

Id.  (internal citation omitted).  "[I]t is not within the province of a reviewing court to

determine the weight of the evidence, nor is it the court's function to substitute its judgement for that of the [Commissioner] if his decision is supported by substantial evidence." Id. Instead, when substantial evidence supports the Commissioner's decision, this court must affirm that decision even if it disagrees with the Commissioner. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). "Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." Hays, 907 F.2d at 1456.

## IV.     DEFENDANT'S OBJECTIONS

The Commissioner claims that the magistrate judge exceeded the scope of judicial review and re-weighed the evidence in this case. The Commissioner argues that the ALJ's determination that plaintiff retained the residual functional capacity to perform the full range of light work was legally correct and supported by substantial evidence, therefore making the use of the Grids entirely appropriate.

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520 (West 2003). If an individual is found "not disabled" at any step, further inquiry is unnecessary.[1] Id. at § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. at § 404.1520(b). If the claimant is not, the second inquiry is whether the claimant suffers from a severe impairment. Id. at 404.1520(c). If

---

[1] A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A) (West 2003).

a severe impairment is present, the third inquiry is whether such impairment meets or

equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative

Regulations No. 4.  Id. at § 404.1520(d).  If it does, the claimant is found disabled and

awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's

impairments prevent the performance of past relevant work.  Id. at § 404.1520(e).  By

satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v.

Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner,

and leads to the fifth and final inquiry: whether the claimant is able to perform other

forms of substantial gainful activity, considering the claimant's remaining physical and

mental capacities and the claimant's age, education and prior work experience.  20 C.F.R.

§ 404.1520(f) (2000); McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983).  The

Commissioner must establish two things: (1) that the claimant, considering his or her age,

education, work experience, skills and physical shortcomings, has the capacity to perform

an alternative job, and (2) that this specific job exists in the national economy.

McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

## V.     ANALYSIS

For the purposes of this order, the first four inquiries are not in dispute.  The only

question is whether the ALJ correctly assessed plaintiff's remaining physical and mental

capacities in determining plaintiff could still perform other forms of gainful activity.

Specifically, the question is whether there was substantial evidence to support the ALJ's

conclusion that plaintiff retained the residual functional capacity to perform the full range

of light work activity, making his reliance on the Grids appropriate.[2]

The ALJ's analysis under the fifth inquiry of the sequential evaluation process is two-tiered. Morgan v. Barnhart, 142 Fed. Appx. 716, 720 (4th Cir. 2005). First, the ALJ must determine the claimant's residual functional capacity ("RFC").[3] Id. (citing 20 C.F.R. § 404.1520(a)(4)(v),(e) (2004)). "RFC is a measurement of the most a claimant can do despite his limitations." Hines v. Barnhart, 453 F.3d 559, 562 (4th Cir. 2006)(citing 20 C.F.R. § 404.1545(a)). Social Security Ruling 96-8p requires that a narrative finding be made concerning the assessment of a claimant's residual functional capacity. A conclusion regarding a claimant's residual functional capacity is required to include a discussion of the medical and non-medical evidence. SSR 96-8p. This discussion must address the maximum work level the claimant can perform on a regular basis. The ALJ must then move to the second part of this analysis: "whether the Commissioner has satisfied her burden of showing that the claimant can engage in a job that 'exist[s] in significant numbers in the national economy.' " Morgan, 142 Fed. Appx. at 720.

_____

[2] With regard to plaintiff's claims for disabling glaucoma, this court agrees with the magistrate judge that there was substantial evidence to support the ALJ's conclusion that plaintiff's condition was not of disabling severity. (Report 9) (citing R. 14, 100, 172, 218.) Furthermore, both the magistrate judge and the ALJ noted that plaintiff failed to list glaucoma as a "disabling condition" on his application for disability benefits. (R. 124.)

[3] The Social Security Administration has defined RFC as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling (SSR) 96-8p, 1996 WL374184, at *1 (West 2006).

Although the ALJ determined that plaintiff could not perform his past relevant work, the ALJ concluded that he had the residual functional capacity to perform the full range of light work activity through the date last insured of December 31, 1994. (R. 219.) The Social Security Administration has stated that:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b) (2006). Specifically, the ALJ found that Mr. McDermott suffers from a severe musculoskeletal impairment, but the ALJ denied benefits, finding that he retains the RFC to perform light work through his date last insured of December 31, 1994 and is therefore not disabled under the grids. (R. 219); See 20 C.F.R., Pt. 404, Subpt. P, App. 2, rule 202.21 (2006).[4] Defendant objects to the magistrate judge's conclusion that it was error for the ALJ to rely on the Grids to direct a finding of not disabled. (R. 9).

This court begins by reviewing the ALJ's finding that plaintiff retains the RFC to perform light work activity. The ALJ specifically found that since March 13, 1989, the plaintiff "has been unable to perform his past relevant work as a die caster or town constable, since he is no longer able to meet the heavy exertional demands required by those occupations." (R. at 223.) Thus, the burden shifted to the Commissioner to show

---

[4] "Appendix 2 is comprised of tables or grids that indicate disability determination for various combinations of age, education, and work experience along with the claimant's residual functional capacity." Gory v. Schweiker, 712 F.2d 929 n.1 (4th Cir. 1983). The court goes on to state that the use of the grids was upheld by the Supreme Court in Heckler v. Campbell, 461 U.S. 458 (1983). Id.

that, in consideration of his age, education, work experience, skills and physical shortcomings, plaintiff is capable of performing other jobs existing in significant numbers in the national economy.  See McLamore, 558 F.2d at 574.  To do this, the ALJ erroneously relied on the Grids as a framework.

As the magistrate judge correctly notes, the Grids may be used to direct a finding of not disabled in certain circumstances.  (R. 9) (citing Hays v. Sullivan, 907 F.2d 1453, 1458 (4th Cir. 1990) (affirming denial of benefits to claimant where the Medical-Vocational Guidelines directed a finding of not disabled)).  The Fourth Circuit has held that:

> the Grids may satisfy the Secretary's burden of coming forward with evidence as to the availability of jobs the claimant can perform only where the claimant suffers solely from exertional impairments.  To the extent that non-exertional impairments further limit the range of jobs available to the claimant, the Grids may not be relied upon to demonstrate the availability of alternative work activities.

Grant v. Scwheiker, 699 F.2d 189, 192 (4th Cir. 1983) (vacating and remanding the district court's decision after concluding that the ALJ's use of the Grids was inappropriate since plaintiff had two non-exertional impairments).  "[W]hen a claimant suffers from both exertional and nonexertional limitations, the grid tables are not conclusive but may only serve as guidelines."  Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989).  In this situation, "the Secretary must produce a vocational expert to testify that the particular claimant retains the ability to perform specific jobs which exist in the national economy."  Grant, 699 F.2d at 192.  This court agrees with the magistrate judge that there is not substantial evidence in the record to support the ALJ's conclusion that

plaintiff could perform the full range of light work activity; thus, the use of the Grids was

inappropriate.            According to Social Security Ruling 96-8p:

> [I]n order for an individual to do a *full range of work* at a
> given exertional level, such as [light], the individual *must be
> able to perform substantially all of the exertional and
> nonexertional functions required in work at that level*. . . .
> Without a careful consideration of an individual's functional
> capacities to support an RFC assessment based on an
> exertional category, the adjudicator may either overlook
> limitations or restrictions that would narrow the ranges and
> types of work an individual may be able to do, or find that the
> individual has limitations or restrictions that he or she does
> not actually have.

SSR 96-8p, 1996 WL 374184, at *3-4 (emphasis added).  Exertional capacity involves

the "individual's limitations and restrictions of physical strength demands: Sitting,

standing, walking, lifting, carrying, pushing, and pulling."  SSR 96-8p, 1996 WL 374184,

at *5.  Nonexertional capacity "assesses an individual's abilities to perform physical

activities such as postural (e.g., stooping, climbing), manipulative (e.g., reaching,

handling), visual (seeing), communicative (hearing, speaking), and mental (e.g.,

understanding and remembering instructions and responding appropriately to

supervision)." SSR 96-8p, 1996 WL 374, at *6; see Aistrop v. Barnhart, 36 Fed. Appx.

145, 147 (4th Cir. 2002) ("Nonexertional limitations generally affect an individual's

ability to meet the nonstrength demands of jobs and include the ability to hold, grasp,

kneel, stoop, and crouch."); Butts v. Barnhart, 388 F.3d 377, 381 n.1 (2d Cir. 2004)

(citing C.F.R. § 416.969a(c)(vi)).  In addition, the Fourth Circuit has held that "pain itself

can be disabling, and it is incumbent upon the ALJ to evaluate the effect of pain on a

claimant's ability to function.  Walker, 889 F.2d at 49.  The Fourth Circuit has stated that

"while there must be objective medical evidence of some condition that could reasonably

produce the pain, there need not be objective evidence of the pain itself or its intensity."

Id. (citing Foster v. Heckler, 780 F.2d 1125, 1129 (4th Cir.1986)).  "[I]n cases where pain

occurs only upon exertion and limits one's strength functioning, the grid tables will apply.

But when a claimant suffers from both exertional and nonexertional limitations, the grid

tables are not conclusive but may only serve as guidelines."  Id. (citing Wilson v.

Heckler, 743 F.2d 218 (4th Cir.1984)); see also Coffman v. Bowen, 829 F.2d 514 (4th

Cir. 1987); 20 C.F.R. Pt. 404, Sbpt. P, App. 2 § 200.00(a), (d)-(e)(2); 20 C.F.R. §

404.1569.  "Whether a given nonexertional condition affects a particular claimant's

residual capacity to engage in certain job activities is a question of fact."  Smith v.

Schweiker, 791 F.2d 723, 725 (4th Cir. 1984).

      This court agrees with the magistrate judge's finding that there is not substantial

evidence to support the ALJ's finding that plaintiff retains the RFC to perform the *full*

*range* of light work activity.  The ALJ must "consider all the evidence and explain on the

record the reasons for his findings, including the reason for rejecting relevant evidence in

support of the claim."  King v. Califano, 615 F.2d 1018, 1020 (4th Cir. 1980).  "Even if

legitimate reasons exist for rejecting or discounting certain evidence, the Secretary

cannot do so for no reason or for the wrong reason."  Id.  Plaintiff's condition consists of

both exertional and non-exertional limitations as evidenced throughout the record.  As a

result, this court agrees with the magistrate judge that the ALJ erred by referring to the

Grids to conclude that plaintiff was not disabled.

The chief non-exertional limitation noted in this case is plaintiff's pain. The Fourth Circuit has held that "it is incumbent upon the ALJ to evaluate the effect of pain on a claimant's ability to function." Hines v. Barnhart, 453 F.3d 559, 564 (4th Cir. 2006). As the magistrate judge notes, the record reflects that plaintiff suffers from constant pain (R. 20) and marked limitations on movement and motion (R. 22, 25). Though pain medications and weekly physical therapy helped reduce plaintiff's pain, the records of the treating physicians demonstrate that the pain persisted throughout plaintiff's alleged disability period. The ALJ noted that he gave thoughtful consideration to plaintiff's allegations of disabling pain and symptoms; however, he did not find the complaints were indicative of disabling dimensions, since plaintiff was able to go shopping, perform light housework, occasionally cook, wash dishes and do laundry. (R. 222.) However, this court considers these activities to be "fairly restricted" activities. See Zurwaski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001) (finding plaintiff's daily activities, which consisted of washing dishes, helping his kids prepare for school, doing laundry, and preparing dinner, were fairly restricted and did not contradict a claim of disabling pain). Plaintiff also noted that although he did do some shopping, he avoided lifting or packing any bags. (R. 127.) While the ALJ noted that plaintiff went for daily walks, visits, and drove an automobile, the record indicates that: (1) he discontinued all other recreational activities (R.127); (2) he took several rest periods during his walks (R. 28); (3) the pain in his back exacerbated with increased activity (R. 24); and (4) plaintiff could drive for 40 miles but would have to stop to rest or have his wife drive him while he laid in the back seat (R. 141, 235.) Furthermore, the records of plaintiff's treating

physicians indicate that plaintiff suffered from constant and chronic low back pain (R. 8, 13, 17, 18, 21, 27, 158), muscle spasms and tenderness (R. 191), and was on several anti-inflammatory medications (R. 6-8, 17-18, 21), as well as a mild anti-depressant to regulate his sleep pattern (R. 8).

In addition to plaintiff's subjective complaints of pain, there is objective evidence in the record which reasonably could cause pain.  There is no doubt that Mr. McDermott suffers from chronic low back pain secondary to a combination of degenerative disc disease, degenerative joint disease and lumbar radiculopathy as evidenced by a CT Scan which showed a disc herniation at L5-S1 with significant neural foraminal narrowing on the left at L5-S1 with some impingement of the nerve root, an EMG which was consistent with L5 radiculopathy (R. 145), and an MRI consistent with L-5 radiculopathy (R. 21).  In discrediting the plaintiff's subjective complaints of pain, the ALJ selected various activities from the record which plaintiff was capable of performing, while ignoring the evidence that demonstrates plaintiff's incapacity to perform the full range of light work activities.  See Hines v. Barnhart, 453 F.3d 559, 566 (4th Cir. 2006) ("The deference accorded an ALJ's findings of fact does not mean that we credit even those findings contradicted by undisputed evidence.").  The ALJ also discredited plaintiff's subjective complaints of pain by stating that plaintiff's treating physicians advised him to seek vocational rehabilitation, but plaintiff declined to do so after June 1989 (R. 222-23.) The ALJ failed to note, however, that plaintiff did attempt vocational rehabilitation but was unable to complete his program due to his disabling pain.  (R. 33.)  As a result of the overwhelming evidence that plaintiff has suffered from severe pain since June 1989 if not

before, this court believes the ALJ erred by ignoring plaintiff's nonexertional limitation which precludes the use of the Grids.  See Hines, 453 F.3d 559; Walker, 889 F.2d 47.

Plaintiff also suffers from severe postural limitations, which are considered nonexertional limitations. See SSR 96-8p, 1996 WL 374184, at *5.  In 1990 Dr. Jaeger documented in plaintiff's vocational rehabilitation medical record that plaintiff was limited from stooping and reaching and should avoid kneeling. (R. 164.) The ALJ discredited Dr. Jaeger's opinion that plaintiff's ability to sit, stand and walk was limited because Dr. Jaeger was a family physician (R. 220), and he ignored Dr. Jaeger's postural limitations regarding plaintiff's residual functional capacity.  In order to discredit a treating physician's opinion, the ALJ must point to evidence that is "inconsistent" or "contradictory."  See Coffman v. Bowen, 829 F.2d 514 (4th Cir. 1987); Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983); see also 20 C.F.R. § 404.1527 (stating treating opinions given controlling weight when not inconsistent with other substantial evidence). If a treating physician's opinion is found to have less than controlling weight, the opinion will still be considered in light of the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the physician's opinion, (4) the consistency of the opinion, and (5) whether the physician is a specialist in the area of his opinion.  20 C.F.R. § 404.1527 (2006).  The ALJ did not find that Dr. Jaeger's report was entitled to controlling weight because it was unsupported by the reports of other treating sources. (R. 220.)  However, as the magistrate judge correctly notes, "the other treating physicians who were specialists in this field made similar findings." (R. 10) (Citing 20 C.F.R. §

404.1527(d)(5)(2001) ("opinion of a specialist about medical issues related to his or her area of specialty are entitled to more weight than the opinion of a physician who is not a specialist.")).  Dr. Dubin and Dr. Forrest, consistently documented in their treating notes that plaintiff had no tolerance for bending. (R. 20-21, 26.) Furthermore, Dr. Dubin noted that plaintiff indicated he had problems with ascending and descending stairs, and it was more difficult for the plaintiff to climb up the stairs. (R. 3.) While plaintiff testified that he is able to stoop, he stated that he can go straight down but needs something to help pull him back up to a standing position. (R. 86.) The ALJ also disregarded Dr. Jaeger's opinion because Dr. Jaeger referred plaintiff to Dr. Aguilar. (R. 220.) However, Dr. Aguilar, whom the ALJ appears to chiefly rely upon to find that plaintiff retained the RFC to perform light work, (R. 159), documented that plaintiff should also avoid excessive bending.  (R. 159.) As the magistrate judge states, the ALJ ignored plaintiff's postural limitations noted in Dr. Aguilar's report and did not discuss these limitations discussed in Dr. Dubin and Dr. Forrest's reports. "While an ALJ may, under the regulations, assign no or little weight to a medical opinion based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings, he may not reject medical evidence for no reason or for the wrong reason." Vance v. Barnhart, 2005 WL 2837559, *6 (W.D. Va. 2005) (ALJ failed to mention treating physician's records and evaluation in his decision).  Furthermore, there is objective evidence in the record which supports plaintiff's nonexertional postural limitations. For example, plaintiff's treating physicians noted that plaintiff suffered marked limitations in the lumbar range of motion. (R. 22, 25.) At best, plaintiff's forward

flexion was limited to 30-40 degrees, while his extension of the lumbar spine was between 5-10 degrees. (R. 20, 21, 25, 27.)

In light of these observations, defendant has failed to persuade the court that the ALJ adequately explained his determination that plaintiff was capable of performing the *full range* of light work. To the contrary, the court finds that the evidence at least indicates that plaintiff's non-exertional limitations, in conjunction with plaintiff's exertional limitations, would preclude the use of the Grids in this case. Accordingly, the court concludes that the ALJ erred by applying the Grids and therefore remands this case to the Commissioner.

## VI.    CONCLUSION

For the foregoing reasons, it is therefore **ORDERED** that this case be **REVERSED** and **REMANDED** to the Commissioner for the purpose of taking vocational expert testimony and for such further administrative action as is deemed necessary and appropriate.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 28, 2006**
**Charleston, South Carolina**